**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DAVID POQUADECK,**

                                        **Plaintiff,**


                    **v.**                                        **5:05-CV-267**
                                                                   **(FJS/GJD)**

**JO ANN BARNHART, Commissioner of**
**Social Security,**

                                        **Defendant.**
_____

**APPEARANCES**                          **OF COUNSEL**

**McMAHON, KUBLICK, McGINTY**            **JENNIFER GALE SMITH, ESQ.**
**& SMITH, P.C.**
500 South Salina Street, Suite 816
Syracuse, New York 13202
Attorneys for Plaintiff

**OFFICE OF THE UNITED**                 **WILLIAM H. PEASE, AUSA**
**STATES ATTORNEY**
100 South Clinton Street
P.O. Box 7198
Syracuse, New York 13261-7198
Attorneys for Defendant

**SCULLIN, Senior Judge**


**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

       Plaintiff filed an application for disability insurance benefits on October 2, 2003, alleging

that he became disabled on September 13, 1994.  *See* Administrative Transcript ("Tr.") at 43.  The

application was denied initially.  *See id.* at 24-28.  Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ"), which was held on August 11, 2004. *See id.* at 13. On September 24, 2004, the ALJ issued a decision denying Plaintiff's application for Social Security Disability benefits. *See id.* at 18-21. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on January 8, 2005. *See id.* at 4-6.[1]

As a result, Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) to review that final decision. In support of his argument that the Court should reverse Defendant's decision and award him benefits, Plaintiff asserts (1) that the ALJ failed to accord proper weight to the opinion of his treating physician, (2) that he cannot perform his past relevant work, (3) that the ALJ failed to assess his allegations of pain properly, (4) that the ALJ failed to assess his Post-Traumatic Stress Disorder, and (5) that there was not substantial evidence to support the ALJ's decision. *See* Plaintiff's Brief at 6-13. To the contrary, Defendant contends that there is substantial evidence in the record to support her decision and that, therefore, the Court should dismiss Plaintiff's complaint.

## II. BACKGROUND

**A.    Personal history**

Plaintiff was born in 1949 and was 55 years old at the time of the administrative hearing in 2004. Plaintiff's most recent employment was with the Onondaga County Sheriff's Department as a

---

[1] The Court notes that Plaintiff filed a previous social security disability application that was denied on January 22, 1997, after an administrative hearing. Although the actual documents relating to that prior application are not part of the record, the ALJ mentioned Plaintiff's prior application at his current hearing and in his decision. *See* Tr. at 19, 318. Moreover, Plaintiff does not contest the fact that, because he was insured for disability benefits only through December 31, 2001, he had to establish disability on or before that date.

deputy sheriff, *see* Tr. at 107, 321, where he worked for approximately twenty years between 1974

and 1994.  As a deputy sheriff, Plaintiff was authorized to carry firearms, and his duties included

apprehending suspects and transporting prisoners.  *See id.* at 320.  On September 12, 1994, Plaintiff

stopped working, complaining of "neck pain, with sharp, shooting pain radiating into his left

shoulder, [and] down into his left arm."  *See id.* at 117.  Plaintiff was on disability status for several

years and then retired from the Sheriff's Department in 1999.  *See id.* at 125.[2]


B.      **Medical evidence in the record**

        ***1. Joseph Smith, M.D., Plaintiff's Treating Physician***

        Joseph Smith, M.D., an orthopedic surgeon, is Plaintiff's treating physician.  Between

September 1994 and August 22, 2002, Dr. Smith examined Plaintiff on more than thirty occasions.

*See id.* at 248-86.  On September 16, 1994, three weeks after his accident, Plaintiff visited Dr. Smith

because he had "developed neck pain with left upper extremity radicular complaints."  *See id.* at

282.  Dr. Smith's examination of Plaintiff revealed decreased forward flexion, decreased extension,

and decreased "lateral tilts."  *See id.*  However, Plaintiff's motor, sensory, and reflex examinations

were normal.  *See id.*  Dr. Smith stated that Plaintiff's x-rays showed evidence of C-6,7 degenerative

arthrosis with "questionable foraminal encroachment."  *See id.*  As a result, Dr. Smith prescribed

physical therapy along with medications, Naprosyn and Flexeril.  *See id.*  Six months later, on

March 16, 1995, Dr. Smith noted that, although Plaintiff continued to have trouble with his cervical

spine, resulting in "intermittent neck pain occasionally radiating towards his shoulder," there were

---

        [2] Between 1968 and 1971, Plaintiff served as a mortician in the United States Army.  In that capacity, his duties included the identification of deceased service personnel in Vietnam.  *See* Tr. at 107, 324.  From 1971 to 1974,  Plaintiff was self-employed as a funeral director.  *See id.* at 107.

no new abnormalities. *See id.* at 279. Moreover, Dr. Smith noted that, although Plaintiff's cervical spine motion was restricted, he had good strength in his left upper extremity and no evidence of reflex loss in downgoing toes. *See id.* He also noted that Plaintiff had been going to physical therapy and had a fairly good result with traction. *See id.* Based upon this examination, Dr. Smith's impression was "C-6, 7 hard disc, resistant to normal therapy." *See id.*

In August of 1995, Dr. Smith referred Plaintiff to Denise Johnson, an Occupational Therapist, Registered ("OTR"), for a functional capacity evaluation, *see* Tr. at 221, which she performed on August 8, 1995. This evaluation included a grip strength test, an upper body range of motion test, body flexibility tests, a lifting ability test, a push/pull test, a carrying ability test, and a body mechanics test. *See id.* at 222-30. After conducting these tests, OTR Johnson determined that Plaintiff was "able to perform medium-heavy work at the present time," *see id.* at 222, and that he could return to "half-time, light-duty work," *see id.*

Between 1995 and 2003, Dr. Smith repeatedly stated that Plaintiff remained totally disabled from his previous job. *See id.* at 261 & 269 (in 1996 and 1998, Plaintiff "[totally disabled] towards his previous job activity"); 271 (same on March 20, 1996); 273 (same on October 30, 1995); 249 (same in 2002); 219 (same on February 13, 2004). However, on December 10, 2001, shortly before Plaintiff's insured status expired, Dr. Smith examined Plaintiff, who told him that his cervical spine, his upper extremities, his knees, and his feet felt better. *See id.* at 251. Dr. Smith found fairly good range of motion of Plaintiff's cervical spine, good range of motion in his upper extremities, reasonable power, and no evidence of neurovascular compromise. *See id.* Dr. Smith concluded that Plaintiff was "doing well with [his] chronic cervical spondylolysis." *See id.* Dr. Smith recommended that Plaintiff avoid high impact loading and prescribed Celebrex along with

-4-

stretching exercises.  *See id.*

Dr. Smith also examined Plaintiff in February and May of 2003.  At the February 2003 examination, Dr. Smith recommended that Plaintiff perform light stretching exercises and take Celebrex.  *See* Tr. at 137.  At the May 2003 examination, Dr. Smith noted that Plaintiff had some intermittent pain that was being treated through "modification of activity, ROM and Celebrex."  *See id.* at 133.  Dr. Smith also determined that Plaintiff had a moderate partial disability.  *See id.*

Furthermore, in 2003, Dr. Smith stated that he was ***unable*** to evaluate Plaintiff for work-related activities by performing a functional capacity evaluation because he did "not have the training or tools to conduct such an evaluation."  *See id.* at 130.[3]  However, the record contains an "Ability to Do Work-Related Activities (Physical) Evaluation" form, which was prepared in Dr. Smith's office and signed on February 13, 2004.  *See id.* 201-04.  It does not appear that Dr. Smith personally signed this form.[4]  The form stated that Plaintiff could not lift more than ten pounds either frequently or occasionally since January 23, 1997, and that he could stand and walk less than two hours during an eight-hour workday and could sit less than six hours in an eight hour day.  *See id.* at 201-02.  On the same day that the form was completed, Dr. Smith wrote in a separate medical report that Plaintiff was "totally disabled from his previous job activity and most other job activities."  *See id.* at 219.

_____

[3] Although the document is not dated, it is located in Exhibit "B-5," which is entitled, "Medical Records covering the period from 2/24/03 to 9/01/03 from Joseph Smith, M.D."  The Court notes that this document is at Tr. 130 and the List of Exhibits is at Tr. 3.

[4] A "nurse/psychotherapist," whose initials are not discernable on the transcript, signed Dr. Smith's name.  *See* Tr. at 204.

### 2. Examining Physicians - Physical

In addition to Dr. Smith, other physicians examined Plaintiff's physical health, including Dr. Zogby, Dr. Termanini, and Dr. Totero.

On February 23, 1995, Richard G. Zogby, M.D., an orthopedic surgeon, diagnosed Plaintiff with cervical radiculitis and stated that Plaintiff "remains totally disabled from work" and should continue physical therapy. *See* Tr. at 278. Dr. Zogby also spoke with a physical therapist about considering a functional capacity evaluation. *See id.* On August 7, 1995, Dr. Zogby determined that Plaintiff's condition remained the same. *See id.* at 275. A week later, Dr. Zogby recommended that surgery not be performed at that time. Dr. Zogby also thought that Plaintiff would "[not] return to his full duties as a policeman" and would have "some long term limitations." *See id.* On April 1, 1997, Dr. Zogby evaluated Plaintiff and noted that multiple options were available but that Plaintiff wanted to avoid surgery. *See id.* at 266. Therefore, Dr. Zogby suggested a "re-trial of physical therapy with traction." *See id.*

Dr. Zafer Termanini, an orthopedic surgeon, examined Plaintiff on May 24, 1995, and on September 9, 1996. During the May 1995 examination, Dr. Termanini found that Plaintiff had "mild shooting pain in his left arm" during a compression test, "mild restriction of range of motion of the cervical spine," and "mild hypertrophic spondylosis." *See* Tr. at 118. However, Dr. Termanini found no motor or sensory deficits in Plaintiff's upper extremities. *See id.* Dr. Termanini determined that Plaintiff could not currently "perform his regular occupation" and that Plaintiff should avoid raising his arms above shoulder level. *See id.* at 119. Additionally, Dr. Termanini found that Plaintiff had a "temporary marked partial causally related disability." *See id.*

In September 1996, Dr. Termanini's examination of Plaintiff revealed no cervical spine

deformity and that the range of motion of Plaintiff's cervical spine had improved since the May 1995 examination. *See* Tr. at 115. At the September 1996 examination, Plaintiff was able to squeeze seventy-five pounds on the right side and eighty pounds on the left side. *See id.* Dr. Termanini stated that Plaintiff had a healed cervical sprain and pre-existing degenerative disease of the cervical spine. Dr. Termanini also stated that Plaintiff had responded "nicely" to conservative treatment, that his condition had improved, and that he had a "mild" orthopedic disability. *See id.* at 116. Dr. Termanini also cited the August 8, 1995 functional capacity evaluation, which stated that Plaintiff could perform medium to heavy duty work. *See id.* at 116.

Dr. Charles M. Totero, a board certified orthopedic surgeon, performed an independent orthopedic evaluation of Plaintiff on April 14, 1999. *See id.* at 120. Plaintiff complained of neck pain that extended to the left shoulder and arm, with tingling and numbness in the left hand. *See id.* at 121. During the examination, Dr. Totero found that Plaintiff had normal range of motion during a "passive" examination of the shoulders, elbows, wrists and small joints of the hands. However, during an "active" examination of the same body parts, Dr. Totero found Plaintiff's range of motion to be "restricted." *See id.* Dr. Totero opined that "[s]ymptom magnification appears to be present." *See id.* Dr. Totero concluded that Plaintiff was capable of returning to work with the restrictions that he not lift more than twenty pounds and that he avoid altercations with inmates. *See id.* at 122.

### 3. Examining Physicians - Mental

Plaintiff alleges that he suffers from Post Traumatic Stress Disorder "PTSD." The record contains the Department of Veterans Affairs' October 9, 2002 "Ratings Decision," *see* Tr. at 123-28, which notes that, on April 8, 2002, Plaintiff applied for an "increase in benefits" and alleged "a new

condition." *See id.* at 123.  PTSD was that "new" condition.  *See id.*  The Ratings Decision evaluated both Plaintiff's alleged PTSD and his lumbosacral strain.  *See id.* at 123-28.  In evaluating Plaintiff's alleged PTSD, the Ratings Decision noted that Plaintiff's April 2002 application was a "first time claim of service connection for [PTSD]."  *See id.* at 124.  Although Plaintiff claimed symptoms upon returning from Vietnam, with periodic exacerbations, once in 1986 and again in 1989, he sought treatment for psychological problems only sporadically until 2002.  *See id.* at 125.

Chetan Haldipur, M.D., a physician from the Veterans Administration Medical Center, evaluated Plaintiff for his alleged PTSD, for the first time, on June 6, 2002, and prescribed Sertraline. *See* Tr. at 146.  On December 4, 2002, Plaintiff told Dr. Haldipur that he was "no longer depressed" and that he was having fewer nightmares.  *See id.* at 145.  Plaintiff also told Dr. Haldipur that his concentration was "good" and that his flashbacks were fewer and did not "bother" him.  *See id.*  On March 28, 2003, Plaintiff told Dr. Haldipur that, when his wife was around, his symptoms were under control.  *See id.* at 143.  On March 28, 2003, May 12, 2003, July 14, 2003, and September 8, 2003, Dr. Haldipur noted that Plaintiff thought that the medication and therapy (group and individual) were helping.  *See id.* at 138-45.  However, Dr. Haldipur noted that the escalation of military activity in Iraq had "exacerbated" Plaintiff's PTSD symptoms.  *See id.* at 143.

Nearly two years after Plaintiff's eligibility expired, Mary Fear, MS, CN, Clinical Nurse Specialist ("CNS"), completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" form.  *See* Tr. at 199-200.  Ms. Fear rated Plaintiff's restrictions as "extreme" for understanding and remembering short, simple instructions, carrying out short, simple instructions, understanding and remembering detailed instructions, carrying out detailed instructions, making judgments on simple work-related decisions, interacting appropriately with the

public, interacting appropriately with supervisors, and responding appropriately in a routine work setting. *See id.* Ms. Fear also rated Plaintiff as having "marked" restrictions for responding appropriately to work pressures in a usual work setting and responding appropriately to changes in a routine work setting. *See id.*

### 4. Non-examining Physicians

Two medical experts reviewed Plaintiff's records and completed Residual Functional Capacity ("RFC") assessments. David Perez[5] completed a physical RFC assessment of Plaintiff on November 14, 2003, *see* Tr. at 157-62, and determined that he could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand and/or walk about six hours in an eight-hour workday. *See id.* at 158.

On November 21, 2003, P.A. Spearman, Ph.D., completed two "psychiatric review" forms. In the first of these reviews, Dr. Spearman determined that there was "Insufficient Evidence" to complete a "psychiatric review" between September 1994 and December 2001. *See id.* at 163. In the second review, Dr. Spearman reviewed the record up to the day of his review, November 21, 2003, *see id.* at 177-90, and noted that Plaintiff would have a mild degree of limitation on daily living activities and in maintaining social functioning. Dr. Spearman also noted that Plaintiff would have a moderate degree of limitation in "maintaining concentration, persistence or pace." *See id.* at 187.

Dr. Spearman then completed a mental RFC assessment for November of 2003. *See id.* at

---

[5] The record is unclear as to David Perez' qualifications. Since the table of contents states that the document that he completed was performed by a "DDS physician," the Court will assume that David Perez is a physician.

191.  Dr. Spearman opined that there would be no significant limitation to Plaintiff's ability to perform many employment-related activities, including his ability to remember locations and work-like procedures, to remember and understand detailed instructions, and to pay attention and concentrate for extended periods.  *See id.* at 191-92.  Dr. Spearman also opined that Plaintiff would be "[m]oderately [l]imited" with other employment-related activities, including his ability to perform activities within a schedule, to maintain regular attendance, and to be punctual with customary tolerances.  *See id.* at 191.  Finally, Dr. Spearman noted that Plaintiff would have "difficulty engaging in some work related tasks" and had the "mental capacity to engage in simple and some complex tasks if he can work alone."  *See id.* at 193.

## III. DISCUSSION

### A.   Disability determination

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. § 1382c(a)(3)(B).

-10-

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps.  However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step.  *See id.*


**B.     Scope of review**

In reviewing the Commissioner's final decision, a court must determine whether the Commissioner applied the correct legal standards and whether there is substantial evidence in the record as a whole to support the decision.  *See Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)) (other citations omitted).  A reviewing court, however, may not affirm an ALJ's decision if it reasonably doubts that the ALJ

applied the proper legal standards, even if it appears that there is substantial evidence to support that decision.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports his decision.  *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citation omitted).  A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) (citations omitted).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quotation omitted).  "It is more than a mere scintilla or a touch of proof here and there in the record."  *Id.*

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Id.* (citations omitted).  "However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision."  *Lewis v. Comm'r of Soc. Sec.*, No. 6:00 CV 1225, 2005 WL 1899399, *1 (N.D.N.Y. Aug. 2, 2005) (citations omitted).

In the present case, the ALJ found (1) that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability; (2) that, although Plaintiff had impairments that are considered severe under 20 C.F.R. § 404.1520(c), these impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4; (3) that Plaintiff's

allegations regarding his limitations were not totally credible; (4) that Plaintiff had mild exertional restrictions on lifting and carrying with non-dominant left upper extremity because of neck injury but did not have any severe functional limitations on his ability to perform the mental requirements of work; (5) that Plaintiff was unable to perform any of his past relevant work; (6) that Plaintiff had transferable skills from his previous work; (7) that Plaintiff had RFC to perform a significant range of light work; (8) that, although Plaintiff's restrictions and limitations did not allow him to perform a full range of light work, there were a significant number of jobs in the national economy that he could perform, e.g., complaint evaluation officer, fingerprint clerk, and registration clerk; and (9) that Plaintiff was not under a disability. *See* Tr. at 20-21.

As noted, Plaintiff takes issue with a number of the ALJ's findings and his ultimate conclusion of non-disability. The Court will address each of Plaintiff's arguments in turn.[6]

### 1. The Treating Physician Rule

The case law as well as the regulations provide that, although a treating physician's opinion is not binding on the Commissioner, the Commissioner must give that opinion controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); 20 C.F.R. § 416.927(d). On the other hand, if other substantial evidence in the record contradicts the treating physician's opinion, the ALJ is not required to give that opinion controlling weight, *see Halloran v.*

---

[6] The Court notes that, to support his motion that the Court reverse the ALJ's decision, Plaintiff argues that he cannot perform his past relevant work. This argument is somewhat puzzling because the ALJ, in fact, reached the same conclusion. The issue in this case, therefore, is not whether Plaintiff can perform his past relevant work but whether, given his limitations and restrictions, there are a significant number of jobs in the national economy that he can perform.

-13-

*Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); however, he "'cannot arbitrarily substitute his own judgment for competent medical opinion[,]'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quotation and other citations omitted).

If he decides not to give controlling weight to the treating physician's opinion, the ALJ must assess the following factors: the length of the treatment relationship; the frequency of examination for the condition in question; the medical evidence supporting the opinion; the consistency of the opinion with the record as a whole; the qualifications of the treating physician; and other factors tending to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(d)(2)-(d)(6); 416.927(d)(2)-(d)(6)

Plaintiff argues that the ALJ substituted his opinion for that of Dr. Smith, his treating orthopedic physician. Moreover, Plaintiff asserts that Dr. Smith's February 13, 2004 RFC evaluation,[7] which indicates that Plaintiff cannot perform even sedentary work, is controlling in this case. Plaintiff made the same argument before the ALJ, and the ALJ found that Dr. Smith's February 13, 2004 report was entitled to no weight because it was issued long after Plaintiff's insured status expired and because the RFC evaluation was inconsistent with other medical evidence in the record, including Dr. Smith's own prior reports. *See* Tr. at 16-17.

There is substantial evidence in the record to support the ALJ's decision not to afford Dr.

---

[7] As previously noted, Dr. Smith's February 13, 2004 RFC evaluation found that Plaintiff could not lift more than ten pounds even occasionally, could sit for less than six hours in an eight-hour day, could not stand and walk more than two hours in an eight-hour day, was limited in pushing and pulling with the upper extremities, could never climb or crawl, and could only occasionally balance, kneel, crouch and stoop. *See* Tr. at 201-02. This evaluation also stated that balancing, kneeling, crouching and stooping would aggravate Plaintiff's condition. *See id.* at 202. Finally, Dr. Smith concluded that reaching, handling, fingering, and feeling were all limited to "occasionally." *See id.* at 203.

-14-

Smith's February 13, 2004 RFC evaluation controlling weight.  Although the ALJ acknowledged that Dr. Smith did not "differentiate" between insured and uninsured periods, the RFC evaluation contains a notation that it applies to "1/23/97-date."  *See id.* at 201.  Moreover, a review of Dr. Smith's contemporaneous reports shows that, prior to 2002, he did not believe that Plaintiff was so limited.  Instead, the record indicates that, on several dates, Dr. Smith stated only that Plaintiff was unable to do his former work as a deputy sheriff.  *See, e.g.,* Tr. at 273 (on October 30, 1995, Plaintiff was totally disabled from "his previous job activity);" *id.* at 271, 269, 261 (on March 20, 1996, July 8, 1996, and December 28, 1998, respectively, Plaintiff was disabled from his "previous job activity").

In addition, on January 3, 2000, Dr. Smith stated that, although Plaintiff had pain, he also had good power, good flexion and extension of the elbows and wrists with good power and no evidence of sensory loss.  *See* Tr. at 258.  As a result, Dr. Smith recommended anti-inflammatory medication, stretching and strengthening exercises, and avoidance of "high impact loading."  *See id.* Three months later, on April 3, 2000, Dr. Smith stated that, although Plaintiff had "intermittent" pain in his neck, especially at the extremes of motion, he had "reasonable" range of motion, although there were restrictions on the range of motion in all directions.  *See id.* at 256.  He also noted that Plaintiff had good range of motion in the upper extremities with "normal motor examination."  *See id.* Thus, Dr. Smith recommended treatment with "intermittent" use of anti-inflammatories and pain medication with "appropriate modification of activity."  *See id.*

Furthermore, on October 29, 2001, Dr. Smith reported that, although Plaintiff came to the office reporting pain, he had "excellent" range of motion in his upper extremities, with normal motor, reflex, and sensory examination of his upper and lower extremities.  *See id.* at 253.

However, he noted that Plaintiff did have decreased forward flexion, extension, and lateral tilt of the cervical spine. *See id.* On December 10, 2001, Dr. Smith stated that Plaintiff was "doing well," that his cervical spine, as well as his upper extremities, knees, and feet felt better, and that he "feels quite a bit better." *See id.* at 251. Therefore, Dr. Smith recommended that Plaintiff continue treatment with Celebrex, avoid "high impact loading,"and perform stretching exercises. *See id.*

Most persuasive is the fact that Dr. Smith's 2004 RFC evaluation is inconsistent with another document that he submitted in 2003. At that time, in response to a request that he submit an RFC evaluation, Dr. Smith wrote that he "***did not have the training or tools to conduct such an evaluation and therefore [he was] unable to attest to the patient's capabilities***." *See id.* at 130 (emphasis added).

In rejecting Dr. Smith's RFC, the ALJ also relied upon the opinions of other examining consultative physicians. *See id.* at 15-16. These reports included Dr. Termanini's 1995 and 1996 reports, indicating that, by September of 1996, Plaintiff had a normal examination with "improved" cervical range of motion and adequate grip strength bilaterally. *See id.* at 115-16. Dr. Termanini also noted that Plaintiff had a "mild" orthopedic disability. *See id.* at 116. Similarly, Dr. Totero's 1999 report indicated that Plaintiff might be exhibiting "symptom magnification," *see id.* at 121, and was able to return to work with the restrictions that he not lift more than twenty pounds and that he avoid altercations with inmates, *see id.* at 122.

Plaintiff refers to these consultative physicians as "insurance company doctors" and contends that their opinions are inadequate because they failed to consider his back injury and his psychiatric impairment. This argument has no merit. Both Dr. Termanini and Dr. Totero are orthopedic physicians and, as such, they would not be qualified to comment on Plaintiff's psychiatric

-16-

impairment.  In any event, they are both examining physicians and their reports are consistent with

all of Dr. Smith's reports, except his 2004 RFC, which is itself inconsistent with Dr. Smith's 2003

statement that he "did not have the training or tools to conduct" an RFC evaluation.

Moreover, although Plaintiff asserts that the "insurance company doctors" never mentioned

his "low back" injury, the Court notes that neither did Dr. Smith until July 11, 2002, at which time

he stated that Plaintiff had a "history" of low back injury from Vietnam and that this caused him

"intermittent low back pain, treated by the VA."  *See id.* at 249.  Furthermore, in his August 25,

2003 report, Dr. Smith notes only that "*[P]laintiff complains of dysfunction and/or pain in the*

*cervical spine*."  *See id.* at 131 (emphasis added).  In addition, Dr. Smith's contemporaneous reports

mention only cervical spine problems.  *See, e.g., id.* at 250-74.  Thus, the record demonstrates that

even Plaintiff's treating physician's medical reports do not substantiate Plaintiff's complaints

regarding his low back for the pertinent time period, i.e., prior to December 31, 2001.

Accordingly, given Dr. Smith's 2003 statement that he lacked the training and tools to assess

Plaintiff's RFC and the other medical evidence in the record that supports the ALJ's RFC

determination, the Court concludes that there was substantial evidence in the record to support the

ALJ's rejection of Dr. Smith's 2004 RFC.


### 2. Plaintiff's subjective complaints of pain

"'An [ALJ] may properly reject [subjective complaints of] pain after weighing the objective

medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must

set forth his or her reasons "with sufficient specificity to enable [the court] to decide whether the

determination is supported by substantial evidence."'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651

(N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ must base his credibility assessment on a two-step analysis of the pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, *5 (N.D.N.Y. Mar. 3, 1998) (citation omitted).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), 416.929(a).  Second, if the medical evidence alone establishes the existence of such impairments, the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).  If, however, the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant has taken to relieve his pain or other symptoms; (5) other treatment that the claimant received to relieve his pain or other symptoms; (6) any measures that the claimant took to relieve his pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to his pain or other symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ found that Plaintiff's limitations and complaints of disabling neck, left

shoulder and arm pain, together with tingling and numbness, were not "totally credible." *See* Tr. at

21.  The ALJ based his opinion on the medical evidence, together with the fact that Plaintiff's pain

was treated "conservatively" with medication and physical therapy.  *See id.* at 17.  In addition, the

ALJ cited Dr. Totero's report, in which he stated that he suspected "symptom magnification."  *See*

*id.* at 16.  Accordingly, based on the record as a whole, the Court concludes that there is substantial

evidence to support the ALJ's assessment of Plaintiff's pain.

### 3. Non-exertional impairment

Plaintiff argues that the ALJ inadequately failed to assess the effects that his PTSD had upon

his ability to work.  The ALJ found that, because Plaintiff worked with his alleged PTSD, both as a

mortician and as a deputy sheriff, and did not claim any symptoms of PTSD until 2002, the PTSD

was not a "severe" impairment prior to the expiration of Plaintiff's insured status on December 31,

2001.

There is substantial evidence in the record to support the ALJ's finding in this regard.  For an

impairment to be "severe," it must "significantly limit" the plaintiff's ability to perform "basic work

activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  The Veterans Administration's "Ratings

Decision" indicated that Plaintiff's claim of PTSD was "new" in April of 2002.  Moreover, although

the Veterans Administration found that the PTSD was "related" to Plaintiff's military service and

that Plaintiff had exhibited some earlier symptoms of PTSD, the ALJ accurately noted that "the

record d[id] not establish that [Plaintiff] had any functional limitations from PTSD, or any other

mental impairment, during the relevant period."  *See* Tr. at 15.  In fact, Plaintiff worked with that

condition until he suffered his job-related physical injury in 1994.  *See* Tr. at 124-25.  Moreover, at

the hearing, Plaintiff testified that what prevented him from working during the period from 1994 through 2001 was severe pain in his neck, left shoulder and arm and that he had no other problems, mental or physical, during that period.  Accordingly, the Court concludes that the ALJ properly assessed Plaintiff's PTSD and its effect on Plaintiff's ability to perform his work-related activities prior to December 31, 2001.

### 4. Vocational expert

If a claimant is unable to perform a full range of a particular exertional category of work, has substantially limiting non-exertional impairments, or the issue is whether a claimant's work skills are transferable to other jobs, the ALJ may use the services of a vocational expert.  *See* 20 C.F.R. §§ 404.1560(a), 416.966(e).  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his  functional limitations.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see id.* at 1554 n.4, a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony,  *see De Leon v. Sect'y of Health & Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  In other words, there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion."  *Dumas*, 712 F.2d at 1554 (footnote omitted); *see also Renna v. Barnhart*, No. 02-CV-765, 2003 WL 21005281, *3 (E.D.N.Y. May 2, 2003) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)) (other citation

omitted).

In this case, Plaintiff argues that the ALJ erred at the hearing in failing to use Dr. Smith's RFC when asking the vocational expert whether Plaintiff could perform other work in the national economy. This claim has no merit. As noted, there was substantial evidence in the record to support the ALJ's decision to discount Dr. Smith's 2004 RFC. Therefore, once he had reached that conclusion, it was entirely appropriate for the ALJ to exclude the limitations listed in that RFC from the hypothetical that he posed to the vocational expert.

In sum, based upon the foregoing, the Court concludes that the ALJ applied the correct legal standards in analyzing Plaintiff's claims. Moreover, there was substantial evidence in the record to support his conclusion that Plaintiff was not under a disability during the relevant time frame. Accordingly, the Court affirms the ALJ's decision.

## IV. CONCLUSION

After carefully reviewing the entire record in this case, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiff's complaint is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court enter judgment in Defendant's favor and close this case.

**IT IS SO ORDERED.**

Dated: July 21, 2006
       Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge